IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES R. WALKER,

        Petitioner,                        No. CIV S-05-1563 GEB EFB P

    vs.

T. SCHWARTZ,

        Respondent.                    <u>FINDINGS & RECOMMENDATIONS</u>

_____/

       Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a 2004 judgment of conviction entered against him in Solano County Superior Court on a charge of voluntary manslaughter. He seeks relief on the grounds that: (1) the trial court violated his right to due process when it failed to instruct the jury that evidence of a defendant's admissions should be viewed with caution; and (2) his upper term sentence was imposed in violation of his rights pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Upon careful consideration of the record and the applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

////

////

## I. Procedural and Factual Background[1]

The killing occurred in the apartment of the victim, Mark Hudson. About six weeks before the killing, Mark[2] had allowed his homeless estranged wife, Evelyn Hudson, to stay in his apartment. Defendant, who was Evelyn's boyfriend, and Sharon Burrows, who is Evelyn's daughter, also moved in.

Late in the evening on May 12, 2003, Mark went to the back bedroom to ask for grocery money. Defendant, Evelyn and Sharon were in the bedroom. The conversation was tense.

Sharon testified that after Mark walked out of the room, defendant said to Evelyn, "'Do you want me to kill him? I'll kill him.' But he wasn't serious. He didn't look serious . . . . [M]y mother said, 'Don't be stupid. Don't say stupid stuff like that.'" When he made the statement, defendant was standing and holding an open pocket knife, which he was using to clean his nails. Sharon told police shortly after the killing that defendant told Evelyn, "You're screaming. Do you want me to kill him? I will kill him," and that he then jumped up and grabbed his knife, which was open. Evelyn told Sharon she should not have told police about defendant's statement in the bedroom. At trial, Evelyn testified that defendant did not say anything like, "Do you want me to kill him?"

Around midnight, Mary Burrows, Evelyn's other daughter, knocked on the door. When Mark opened the door and saw Mary, his whole demeanor changed. He slammed the door and locked it, shouting, "I don't want that bitch in my house. Get that cunt out of here." Evelyn went outside to talk to Mary and then told her to wait in defendant's car.

Mary testified that Mark was angry with her because when she was 12 years old she reported Mark to the police for sexually assaulting her. Mark was arrested and Mary testified against him in court.

When Evelyn came back into the apartment, Mark screamed that Mary was not supposed to come to his apartment and he and Evelyn started arguing. Mark stepped in Evelyn's way; he was

---

[1] The following summary is drawn from the April 28, 2005 opinion by the California Court of Appeal for the First Appellate District (hereinafter Opinion), at pgs. 1-5, filed in this court on November 7, 2005 as Ex. 5 to the Answer. This court presumes that the state court's findings of fact are correct unless petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004). Petitioner has not overcome the presumption with respect to the underlying events. The court will therefore rely on the state court's recitation of the facts.

[2] Because several of the key figures in the incident share last names, we use their first names for purposes of clarity.

2

"right in [her] face" and looked like he was about to hit her. Bains, a friend of Sharon and Mark who had come by the apartment, stepped between Mark and Evelyn and tried to calm Mark down, but was ineffective.

Mark ordered Evelyn to pack up and leave. According to both Sharon and Bains, defendant told Mark that Evelyn was right, she did not have to leave because she was Mark's wife. Defendant challenged Mark to call the police and see what they had to say. Mark turned toward defendant and said, "What are you going to do about it?" Sharon and Bains testified variously that defendant either put his head down and said nothing, or he calmly said, "I don't want to start nothing with nobody." Sharon and Bains then left the apartment.

Evelyn told Mark she would get out and she went to her room where defendant helped her pack. As they were getting ready to leave, Evelyn saw defendant's closed pocket knife on the hope chest at the end of the bed and she handed it to him.

Evelyn went to the front door and put her things down so she could open the door. As she was trying to unlock the door, Evelyn saw Mark coming at her from about ten feet away. She thought he was going to hit her. Defendant said, "You're not going to touch her . . . You're not going to hurt her again . . . Just leave us alone and let us go." Mark said, "What, you want a piece of me?" Evelyn looked over toward Mark and saw him hit defendant on the head.

Evelyn initially testified that Mark hit defendant on the head with a butane tank, but then recanted and testified that she was not sure he had a tank in his hand. In her statement to the police, she said as far as she could see Mark had nothing in his hands when he hit defendant, but she was nearsighted. After Mark hit defendant, Evelyn saw defendant jump up and punch Mark in the chest with his fist. Mark stood back, said, "You got me, I'm dead," and then went down on his knees.

Evelyn put her things outside the door and when she came back into the apartment, Mark was lying on the floor. At trial Evelyn testified that she asked defendant, "What did you do? You just punched him, didn't you?" He said, "No, I stabbed him." In her interview with the police, Evelyn said she told defendant, "Why did you do that? . . . Why did you think you had to do that? I mean, I know you're littler than him and all that." She said that defendant answered, "Well I had it in my hand. I didn't even realize the blade was open."

Evelyn testified that defendant looked very afraid during the altercation. Mark was much larger than defendant, six feet tall and about 220 pounds to defendant's five feet three inches and 123 pounds. Evelyn had told defendant about Mark's history of

3

|   |   |
|---|---|
| 1 | violently assaulting her and her daughter, and a few days before the killing Evelyn and defendant had heard Mark breaking mirrors in his bedroom because he was upset that his girlfriend had left him. |
| 2 | |
| 3 | |
| 4 | Defendant told Evelyn to dial 911 and call an ambulance. He said, "You don't know me" and ran out of the apartment. Evelyn did not check on Mark's condition and she did not call 911. She made two more trips to the back bedroom to gather her belongings and then left the apartment. She brought her things to defendant's car, where Mary was waiting. Mary relayed the message that defendant said she should meet him by the waterfront, and they drove there. Defendant showed up at daybreak, and he and Evelyn drove to Sacramento. They were arrested the following morning. |


<br/>

1  violently assaulting her and her daughter, and a few days before
   the killing Evelyn and defendant had heard Mark breaking mirrors
2  in his bedroom because he was upset that his girlfriend had left
   him.
3
   Defendant told Evelyn to dial 911 and call an ambulance. He said,
4  "You don't know me" and ran out of the apartment. Evelyn did
   not check on Mark's condition and she did not call 911. She made
5  two more trips to the back bedroom to gather her belongings and
   then left the apartment. She brought her things to defendant's car,
6  where Mary was waiting. Mary relayed the message that
   defendant said she should meet him by the waterfront, and they
7  drove there. Defendant showed up at daybreak, and he and Evelyn
   drove to Sacramento. They were arrested the following morning.
8
   Mark was found lying on the living room floor near the couch at
9  about 8:00 a.m. on May 13, 2003. The autopsy revealed that he
   died of a stab wound to the chest. The fatal stab wound was three
10 inches deep on the right side of his chest and it cut through the
   aorta. There was a second, nonfatal stab wound on the left side of
11 his chest under the armpit, which superficially cut the skin. Mark
   also had a laceration on the right side of his forehead and several
12 small scrapes and bruises, mostly on his extremities. A forensic
   pathologist opined that these injuries could have been caused
13 either by a blow or a fall. A large amount of methamphetamine
   was found in Mark's blood (0.54 mg where the analyzing
14 laboratory indicated 0.60 mg was a potentially toxic dose), but it
   did not contribute to his death. A police officer who interviewed
15 defendant two days after the killing visually examined defendant
   and did not observe any injuries on his face or head.
16
   Defendant was charged by information with murder (Pen.Code, §
17 187, subd. (a)), and it was alleged that he used a knife during the
   commission of the offense (Pen.Code, § 12022, subd. (b)). The
18 jury was instructed on first and second degree murder, voluntary
   manslaughter on the theories of provocation and imperfect
19 self-defense, involuntary manslaughter, and justifiable homicide in
   self defense and defense of others. During deliberations, the jury
20 asked for a readback of Sharon's testimony "about what James
   Walker said about killing Mark Hudson."
21
   The jury found defendant guilty of voluntary manslaughter (§ 192,
22 subd. (a)) and found the enhancement to be true. The court
   sentenced defendant to the upper term of 11 years with an
23 additional year for the weapon enhancement.

24    Petitioner filed a timely appeal of his conviction in the California Court of Appeal for the

25 First Appellate District, in which he raised the same two claims contained in the instant petition.

26 Answer, Ex. 3. Petitioner's conviction and sentence were upheld in a reasoned decision dated

4

April 28, 2005. Answer, Ex. 5. Petitioner subsequently filed a Petition for Review in the California Supreme Court, raising the same claims. Answer, Ex. 6. That petition was denied with the following reasoning:

> Petition for review denied without prejudice to any relief to which defendant might be entitled upon finality of *People v. Black* (2005) 35 Cal.4th 1238 regarding the effect of *Blakely v. Washington* (2004) 542 U.S. ___, 124 S.Ct. 2531, and *United States v. Booker* (2005) 543 U.S. ___, 125 S.Ct. 738, on California law.

Answer, Ex. 7.

**II.     Analysis**

**A. Standards for a Writ of Habeas Corpus**

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a different result. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because

5

that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

**B. Petitioner's Claims**

**1. Jury Instruction Error**

Petitioner's first claim is that the trial court violated his right to due process when it failed to instruct the jury, *sua sponte*, with CALJIC No. 2.71 ("evidence of an oral admission of the defendant not made in court should be viewed with caution").[3] Pet., Exs. A, C. The California Court of Appeal rejected this claim, reasoning as follows:

> "When evidence is admitted establishing that the defendant made oral admissions, the trial court ordinarily has a sua sponte duty to instruct the jury that such evidence must be viewed with caution." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1200.) This rule applies to pre-offense statements of intent as well, "although the risk of conviction because of a false preoffense statement alone is less than the risk of conviction upon a false confession or admission." (*People v. Carpenter* (1997) 15 Cal.4th 312, 392; *People v. Beagle* (1972) 6 Cal.3d 441, 455, fn. 5.) The required

---

[3] Respondent asserts that petitioner's jury instruction claim is unexhausted. Answer, at 2. The state court record reflects that petitioner argued in his petition for review before the California Supreme Court that the trial court's instructional error violated state law. *See* Answer, Ex. 6 at 3-7. However, assuming *arguendo* that petitioner's federal due process claim was not exhausted in state court, this court recommends that it be denied on the merits. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

6

jury instruction, CALJIC No. 2.71.7, provides: "Evidence has been received from which you may find that an oral statement of intent was made by the defendant before the offense with which he is charged was committed. [¶] It is for you to decide whether the statement was made by the defendant. [¶] Evidence of an oral statement ought to be viewed with caution." (*People v. Heishman* (1988) 45 Cal.3d 147, 166.) The purpose of the cautionary instruction is to assist the jury in determining if the admission was in fact made and if it was accurately reported. (*Beagle*, at p. 456.)

The People concede that the trial court erred by failing to give this cautionary instruction at defendant's trial in light of Sharon's testimony that defendant said, "I'll kill him."

To determine whether the error requires reversal of defendant's conviction, we inquire whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given. (*Carpenter, supra*, 15 Cal.4th at p. 393 .) The test requires more than a mere possibility of a more favorable result. (*People v. Watson* (1956) 46 Cal.2d 818, 837.) "[A] reversal will result only when there exists, in the opinion of the court, at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error has affected the result." (*Ibid.*)

Sharon, a witness not hostile to defendant, testified that defendant made the statement and, further, that her mother, Evelyn, rebuked her for telling the police about the statement. Evelyn denied the defendant made the statement. She was impeached several times with her pretrial statement to police. We conclude that in light of the evidence and the instructions given the jury, it is not reasonably probable that a verdict more favorable than manslaughter would have been reached had the instruction been given.

The jury was fully instructed on judging the credibility of witnesses, a factor that has been cited by the Supreme Court to support a finding of harmless error when the cautionary instruction has not been given. (*Carpenter, supra*, 15 Cal.4th at p. 393; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1224-1225.) Here, the jury was fully instructed with CALJIC Nos. 2.13 (prior consistent or inconsistent statements), 2.20 (believability of witness), 2.21.1 (discrepancies in testimony), 2.21.2 (witness wilfully false), 2.22 (weighing conflicting evidence), and 2.27 (sufficiency of testimony of one witness). (*See People v. Shoals* (1992) 8 Cal.App.4th 475, 499.) In light of the factual context in which the statement was introduced at trial, there is little question that the jury would have viewed Sharon's testimony with caution and utilized the foregoing instructions to carefully weigh her claim that defendant made the alleged statement.

7

Opinion at 5-6.

A challenge to jury instructions does not generally state a federal constitutional claim. *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983). However, "[f]ederal habeas relief is available for jury instruction errors that 'so infected the entire trial that the resulting conviction violates due process,' thus rendering the trial fundamentally unfair." *Townsend v. Knowles*, 562 F.3d 1200, 1209 (9th Cir. 2009) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). *See also Hines v. Enomoto*, 658 F.2d 667, 672 (9th Cir. 1981) (citing *Quigg v. Crist*, 616 F.2d 1107 (9th Cir. 1980)). The analysis for determining whether a trial is "so infected with unfairness" as to rise to the level of a due process violation is similar to the analysis used in determining, under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), whether an error had "a substantial and injurious effect" on the outcome. *See Hedgpeth v. Pulido*, ___ U.S. ___, 129 S.Ct. 530, 531 (2008).

For the reasons explained by the California Court of Appeal, this court concludes that the trial court's failure to advise the jury that petitioner's statement "I'll kill him" should be viewed with caution did not render petitioner's trial fundamentally unfair or have a "substantial and injurious effect" on the verdict. Petitioner's jurors were fully advised on their duty to judge the credibility of the witnesses and to evaluate inconsistent testimony. Further, as explained by the California Court of Appeal, there was evidence at trial that petitioner may not have made the statement attributed to him by Sharon, thereby highlighting a possible problem with the reliability of this evidence. It is difficult to see what difference the cautionary instruction would have made in this context. *See Townsend*, 562 F.3d at 1209 (court must evaluate the challenged jury instructions "in the context of the instructions as a whole"). Moreover, there is no evidence that the jury misapplied the instructions on evaluating the credibility of witnesses in a manner that violated petitioner's constitutional rights. See *Carriger v. Lewis*, 971 F.2d 329, 334 (9th Cir. 1992) ("It is not sufficient that the instruction is erroneous; rather the petitioner must establish that there was a reasonable likelihood that the jury applied the instruction in a way that

violated a constitutional right").

The decision of the state appellate court rejecting petitioner's jury instruction claim is not contrary to or an unreasonable application of United States Supreme Court precedent. Accordingly, petitioner is not entitled to relief on this claim.

### 2. Sentencing Error

Relying on *Blakely v. Washington*, 542 U.S. 296, 303 (2004), petitioner claims that he was deprived of his federal constitutional right to a jury trial when the sentencing judge imposed the upper term sentence based on facts that were not found by the jury beyond a reasonable doubt. Pet., Ex. A (section entitled "Appellant's Supplemental Brief"); Ex. C at 5-10.

#### a. Background

A criminal defendant is entitled to a trial by jury and to have every element necessary to sustain his conviction proven by the state beyond a reasonable doubt. U.S. CONST. amends. V, VI, XIV. In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment requires any fact other than a prior conviction that "increases the penalty for a crime beyond the prescribed statutory maximum" to be "submitted to a jury and proved beyond a reasonable doubt." The *Apprendi* decision allows for a narrow exception, as set forth in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998). In *Almendarez-Torres*, the Supreme Court held that the fact of a prior conviction does not have to be determined by a jury before a sentencing court may use the conviction as the basis for a sentencing enhancement. Prior convictions may be found by the judge based on a preponderance of evidence. *Id.* at 239-47. *See also United States v. Medina-Villa*, 567 F.3d 507, 520 (9th Cir. 2009) ("*Almendarez-Torres* remains good law").

In *Blakely*, the United States Supreme Court decided that a defendant in a criminal case is entitled to have a jury determine beyond a reasonable doubt any fact that increases the statutory maximum sentence, unless the fact was admitted by the defendant or was based on a prior conviction. 542 U.S. at 303-04. The Supreme Court also clarified the definition of "statutory

maximum" for purposes of the constitutional rule: "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional facts." *Id*. at 2537. In *United States v. Booker*, 543 U.S. 220 (2005), the United States Supreme Court applied *Blakely* to the Federal Sentencing Guidelines. The court clarified that "'the statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Id.* at 232.

Shortly after *Booker* was decided, the California Court of Appeal rejected petitioner's Sixth Amendment "*Blakely*" claim. The court reasoned as follows:

> In a supplemental brief, defendant contends his sentence must be reversed under *Blakely v. Washington* (2004) ___ U.S. ___, 124 S.Ct. 2531 (*Blakely*) because in imposing the upper term the trial court, and not the jury, made the findings on aggravating factors in violation of his rights to jury trial and due process.[4]
>
> Under the California sentencing scheme the lower, middle and upper terms constitute a range of authorized punishments for a given crime; the exercise of judicial discretion in selecting the upper term based on aggravating sentencing factors does not implicate the right to a jury determination because the upper term is within the authorized range of punishment. A defendant who is convicted of voluntary manslaughter faces a maximum prison term of 11 years in prison that may be imposed "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (*Blakely, supra*, 124 S.Ct. at p. 2537.) As *Blakely* explained, "In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' [citation], and the judge exceeds his proper authority." (*Ibid.*) It is instructive that, in distinguishing between permissible and impermissible schemes, the court in *Blakely* explained: "In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year

---

[4] The issue of whether *Blakely* precludes a trial court from making findings on aggravating factors in support of imposing an upper term sentence is currently pending in [the California] Supreme Court. (*People v. Towne*, *review granted* July 14, 2004, S125677; *People v. Black*, *review granted* July 28, 2004, S126182.)

> sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is entitled to no more than a 10-year sentence-and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury." (*Blakely*, at p. 2540, italics in original.) Here, the 11-year upper term was the maximum statutorily authorized sentence for violating Penal Code section 192, subdivision (a). The court's imposition of that maximum did not violate defendant's rights to jury trial or due process.[5]
>
> There is no sentencing error.

Opinion at 6-8.

Shortly after petitioner's appeal was decided, the California Supreme Court decided *People v. Black*, rejecting the *Apprendi/Blakely* Sixth Amendment challenge to California's Determinate Sentencing Law (DSL) posed in that case. The California court held that the discretion afforded to a sentencing judge in choosing a lower, middle or upper term in a DSL case rendered the upper term under California law the "statutory maximum" within the contemplation of *Apprendi* and *Blakely*. 35 Cal.4th at 1257-61, *cert. granted and judgment vacated*, 549 U.S. 1190 (2007). Thus, the decision in *Black* was the law in California when the California Supreme Court denied petitioner's petition for review "without prejudice to any relief to which defendant might be entitled upon finality of *People v. Black*, . . ." Answer, Ex. 7.

Subsequently, and while the instant petition was pending, the United States Supreme Court decided *Cunningham v. California*, 549 U.S. 270 (2007). Citing *Apprendi* and *Blakely*, the court in *Cunningham* held that California's DSL violates a defendant's right to a jury trial to the extent it permits a trial court to impose an upper term based on facts found by the court rather than by a jury. The court determined that the middle term under the DSL is the maximum term that may be imposed on the basis of the jury's verdict alone. *Id.* at 288. The Ninth Circuit

---

[5] The United States Supreme Court recently decided *United States v. Booker* (2005) __ U.S. __ [125 U.S. 738]. *Booker*, in our view, clarifies that *Blakely*'s Sixth Amendment concerns are inapplicable to statutory provisions that merely permit, but do not compel, the imposition of a particular sentence upon a particular finding of fact. In California, section 1170 permits, but does not compel, the imposition of an upper term upon the finding of one or more aggravating factors. (*See People v. Scott* (1994) 9 Cal.4th 331, 349-350.)

11

subsequently held that *Cunningham* may be applied retroactively on collateral review. *Butler v. Curry*, 528 F.3d 624, 639 (9th Cir. 2008).

### b. **Analysis**

Voluntary manslaughter in California is punishable by a term of three, six or eleven years in state prison. Cal. Penal Code § 193. At the time of petitioner's sentencing hearing, California Penal Code § 1170(b) provided in relevant part that "the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime." Under the DSL at that time, the sentencing court imposed the middle term unless it found aggravating or mitigating factors relating to the offender or the offense and stated the factors supporting the upper or lower term on the record. *People v. Sandoval*, 41 Cal.4th 825, 836 (2007). Then and now, a single aggravating factor is a sufficient basis for the imposition of the upper term. *People v. Black*, 41 Cal.4th 799, 813-15, 62 (2007) (*Black II* ), *cert. denied*, 128 S.Ct. 1063 (2008) ("Therefore, if one aggravating circumstance has been established in accordance with the constitutional requirements set forth in *Blakely*, the defendant is not legally entitled to the middle term sentence, and the upper term sentence is the statutory maximum").[6]

---

[6] Among other factors, the California Rules of Court identify the following as "circumstances in aggravation" which justify an increased sentence:

**(b) Factors relating to the defendant**

Factors relating to the defendant include that:

(1) The defendant has engaged in violent conduct that indicates a serious danger to society;

(2) The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness;

(3) The defendant has served a prior prison term;

(4) The defendant was on probation or parole when the crime was committed; and

At the sentencing hearing, the trial court selected the upper term of 11 years for petitioner's conviction for voluntary manslaughter. Clerk's Transcript on Appeal (CT) at 324. The judge explained his reasons for choosing the upper term as follows:

> . . . For the crime of which he's convicted – and one of the things I think nobody talks about in the probation report, or mentions, is that the – is the evidence which was presented at the time of trial that occurred approximately an hour before the killing, which involved conversations given to the Court and to the jury by two separate witnesses referring to the potential of attacking the victim. As I recall, one of the victim – one of the witnesses testified that, "Do you want me to take him out?" Another, I think, actually used the word "kill." So it seemed that there was some predisposition to become involved in a confrontation, whether or not it was a murderous one or not. And to me, that is a strong factor that should be considered by the Court.
>
> And because of that and because of the nature of this crime, the fact that this defendant has served a prior prison term, he's been on innumerable – well, numerable grants of probation and has failed all of them, I am going to select as the term in this case the aggravated term of 11 years.

Reporter's Transcript of Judgment and Sentence, at 11-12.

The state court record reflects that after the jury was discharged, the trial judge and petitioner's counsel engaged in a discussion about petitioner's prior misdemeanor convictions. RT at 480-81. At the sentencing proceedings, petitioner's counsel noted that petitioner had suffered prior convictions, including "driving on a suspended license, possession of dope, and . . . misdemeanor petty theft." Reporter's Transcript of Sentencing Proceedings at 8. Before pronouncing sentence, the trial judge noted that petitioner's "record shows a continual and ongoing life of crime for the last 15 years up to the present time." *Id.* at 11. In his "statement in mitigation" filed by petitioner's trial counsel in advance of the sentencing hearing, counsel noted

---

> (5) The defendant's prior performance on probation or parole was unsatisfactory.

Cal. Rules of Court, Rule 4.421

13

that petitioner "ended up in prison at age 18 on drug-related charges." CT at 285. The pre-sentence report in this case was sealed in the state court and has not been provided to this court. However, in respondent's brief in opposition to petitioner's direct appeal, respondent explained that the probation report recommended petitioner be sentenced to the upper term because the crime involved great violence; petitioner had engaged in violent conduct indicating he was a serious danger to society; petitioner's prior adult convictions were numerous; petitioner had served a prior prison term; petitioner was on three grants of probation at the time of the instant offense; and petitioner's prior performance on parole and probation was unsatisfactory. Answer, Ex. 4 at 20-21.

In light of these facts, petitioner's upper term sentence does not violate his federal constitutional rights. The sentencing judge imposed the upper term, in part, on the basis of petitioner's prior criminal history, including the fact that he had served a prior prison term and had failed previous grants of probation. Pursuant to *Almendarez-Torres*, the trial judge was entitled to rely on the record of petitioner's prior convictions to impose the upper term sentence. In addition, the *Apprendi* decision does not apply if the defendant admits any fact relied upon by the judge to increase the statutory maximum sentence. *Blakely*, 542 U.S. at 303-04. In this case, petitioner, through counsel, admitted at the sentencing proceedings and in his statement of mitigation that petitioner had numerous prior convictions and had served a prior prison term. Petitioner's sentence is in compliance with *Apprendi* and *Blakely* because the facts the judge used in imposing the upper term (petitioner's prior convictions) were either admitted by petitioner or were properly admitted under the *Almendarez-Torres* exception to *Apprendi*. *See*, *e.g.*, *United States v. De Leon*, 444 F.3d 41, 54-55 (1st Cir. 2006) (finding no *Blakely* error when the sentencing judge relied on facts stipulated to at trial). As noted above, in California a single factor in aggravation is sufficient to justify the imposition of the upper term. Accordingly, the trial court's reliance on petitioner's prior convictions or prior prison term would be sufficient to support the imposition of the upper term on its own. Because at least one aggravating

circumstance was established, the statutory maximum changed from the middle term to the upper term. *Black II*, 41 Cal.4th at 812. This court is bound by the California Supreme Court's interpretation of its sentencing law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). For all of the foregoing reasons, petitioner is not entitled to relief on this claim.

**III. Conclusion**

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: March 11, 2010.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE